1                UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4 UNITED STATES OF AMERICA,    ) Case No. LA CR 24-00630-PA-1
                             )
5          Plaintiff,     )
                             ) Los Angeles, California
6 vs.                     )
                             ) Monday, October 28, 2024
7 ADAM IZA,             )
                           ) (2:42 p.m. to 3:19 p.m.)
8          Defendant.    )
  _____)
9

10                TRANSCRIPT OF MINUTES OF
          STATUS CONFERENCE RE MEDICAL TREATMENT
11        BEFORE THE HONORABLE A. JOEL RICHLIN
           UNITED STATES MAGISTRATE JUDGE
12

13 Appearances:            See next page.

14 Court Reporter:         Recorded; CourtSmart

15 Courtroom Deputy:       Claudia Garcia-Marquez

16 Transcribed by:        Jordan Keilty
                        Echo Reporting, Inc.
17                        9711 Cactus Street, Suite B
                        Lakeside, California 92040
18                        (858) 453-7590

19

20

21

22

23

24

25 Proceedings recorded by electronic sound recording; transcript produced by transcription service.

*Echo Reporting, Inc.*

2

APPEARANCES:

For the Plaintiff:          DANIEL J. O'BRIEN, ESQ.
                            Office of the United States
                              Attorney
                            312 North Spring Street
                            15th Floor
                            Los Angeles, California 90012
                            (213) 894-2468

For the Defendant:          JOSEF SADAT, ESQ.
                            Law Office of Josef Sadat
                            9171 Wilshire Boulevard
                            Suite 500
                            Beverly Hills, California
                              90210
                            (310) 988-2627

3

1 Los Angeles, California; Monday, October 28, 2024 2:42 p.m.

2                              --o0o--

3                          (Call to Order)

4         THE CLERK:  Calling Case 2:24-CR-630, United

5 States of America versus Adam Iza.

6         Counsel, please state your appearances for the

7 record.

8         MR. O'BRIEN:  Good afternoon, your Honor.  Daniel

9 O'Brien appearing on behalf of the United States.

10        THE COURT:  Good afternoon.

11        MR. SADAT:  Joe Sadat for the Defendant, who's

12 present in custody, your Honor.

13        THE COURT:  Good afternoon to you, Mr. Sadat, and

14 to you, Mr. Iza.

15        So, I think we're here really just to sort of

16 check in and make sure that everything is moving along, Mr.

17 Iza, with your medical care.  The Government filed a status

18 report which looked very promising.

19        It looks like, Mr. O'Brien, you reached to Ms.

20 Shen (phonetic) to apprise her of the situation.  She is a

21 supervisory attorney over at the Bureau of Prisons, and it

22 looks like, Mr. Iza, my understanding is you have received a

23 medical screening evaluation and you have already received a

24 referral from the Federal Bureau of Prisons to a specialist

25 for further examination.

4

1       Is that all correct?

2           MR. O'BRIEN:  Yes, your Honor.  Can I just

3   supplement something?  Just before the hearing, I contacted

4   Ms. Shen again just to get a further update.  My

5   understanding is that the referral has not yet been -- well,

6   the referral was made.  No such appointment has been

7   scheduled.  The -- there's a contractor that schedules such

8   appointments called IMS.  I can't remember what it stands

9   for.  And they're at least exploring the possibility of

10  rather than referring him to an orthopedic, but, rather,

11  contacting the doctor who performed the surgery in Nevada to

12  see if that's an option.  I don't -- I can't make any

13  representations as to whether that will indeed happen --

14  happen.  I just know that that's what they're looking at as

15  a possibility.

16          THE COURT:  Okay.  And, you know, just from my

17  perspective, that -- those all seem like reasonable things

18  to consider and explore and -- and what I would hope and

19  expect from the BOP, and just for Mr. Sadat's edification,

20  for whatever it's worth, I've had prior interaction with Ms.

21  Shen and found her to be very responsive and helpful, so was

22  not surprised to see that Mr. O'Brien reached out to her and

23  not surprised that she's been responsive and helpful.  So, I

24  suspect that she'll continue to do that.  So, she's a great

25  contact.

5

1          MR. SADAT:  I -- I've known Ms. Shen for many

2    years, and I actually emailed her I want to say within 48

3    hours from our last court date.  She's on point, doing

4    everything she can to help.

5          Your Honor, I did want to make a -- a full record

6    of everything.

7          THE COURT:  Sure.

8          MR. SADAT:  Can I have at least maybe 5 to 10

9    minutes to do that?

10          THE COURT:  Sure.

11          MR. SADAT:  Okay.  So, just to follow up -- and

12    Mr. O'Brien has gone above and beyond to help with this

13    situation too.  So, that's very much appreciated.  But I

14    just wanted to explain why it's so urgent, number one, and,

15    number two, why it's so important to have that particular

16    doctor.

17          I did forward an email from the doctor that was

18    sent October 16th, and before we get to that, though, I had

19    emailed Ms. Shen, I believe it was on Sunday or Monday after

20    our court date, and I attached all of the medical records,

21    as well as the initial letter from Doctor D. in Vegas.  And,

22    just to refresh the Court's memory, so, Doctor D. made it

23    clear that it was "medically necessary" to take this

24    hardware out, number one.  Number two, that it needed to be

25    done immediately and, number three, that it should be done

6

1  not just with an orthopedic surgeon but someone with that

2  subspecialty of leg lengthening.

3          He then sent a followup email where he said --

4  this is on October 16th:

5              "There are potentially greater

6          medical risks if the surgery is

7          performed by someone who did not perform

8          the initial procedure.  This is

9          especially true given that few surgeons

10         worldwide possess our level experiences

11         with this specific implant and

12         technology.  Factors such as

13         unfamiliarity with the intricacies of

14         the device, nuances of the initial

15         surgical technique, and proper

16         management of post-operative issues

17         could increase the risk of

18         complications, including improper

19         removal, damage to surrounding tissues,

20         infection, or mechanical failure."

21         He then proceeds to confirm that he's available to

22  do the surgery for Mr. Iza and then notes that he works

23  specifically closely with these implants and technologies

24  and that he has at this point implanted and removed more of

25  these specific implants than anyone in the world.  And he

7

1  says that these techniques that he has to mitigate the
2  complications and troubleshoot issues intro-operatively are
3  not strictly followed, they would then lead to those type of
4  risks that we had mentioned before.  And he goes on to -- to
5  end his letter by saying that his unique familiarity with
6  both the implants and the nuances of their removal ensures
7  the best possible outcome for the patient.
8        I then wanted to just -- moving on from that
9  letter, just make some notes that I think are a little bit
10 inconsistent with some of the BOP notes, and these are notes
11 that I had gone ahead and emailed to the Prosecution today,
12 and these are in email format from Mr. Iza to the BOP.  The
13 first incident date of -- that was noted was October 3rd.
14 He says:
15            "Hello.  I need to see someone
16            regarding both my legs extremely
17            urgently.  I have metal rods and screws
18            in both my legs, and with every
19            movement, I can feel them hurting my
20            nerves.  I'm also developing big balls,
21            lumps on both my legs where the rods are
22            in.  I'm beginning to limp on my left
23            leg, and it's concerning me a lot."
24            That was October 3rd.  October 5th:
25                "Hello, I need to see someone

8

1    regarding my legs, please.  I'm in a lot

2    of pain."

3    October 6th:

4        "Hello, I'm sending a reminder that

5    I'm still awaiting the doctor in regards

6    to my legs.  My left leg is starting to

7    become very painful."

8    October 7th:

9        "Following up again in regards to

10   my last request.  I'm having incredible

11   pain in my left leg at night."

12   October 8th:

13       "Hello, I'm following up again on

14   my request for legs.  The pain is

15   increasing daily."

16   October 9th:

17       "Hello, Still writing regarding my

18   legs."

19   October 12th:

20       "Hello, I am following up again

21   regarding my legs.  I'm currently seeing

22   big bumps on my left leg, and it hurts

23   to touch it, and every time it moves

24   when I sit down or stand up.  I still

25   haven't been seen by a medical doctor in

9

1          the last weeks that I've asked to see

2          one.  Please come and see me as I'm

3          afraid I'm damaging my legs every day."

4               "Hello, Follow up once more."

5          This is October 14th:

6          "I have not been seen by anyone for

7          weeks.

8               And, to take a step back, October 13th:

9               "Hello, please get to me regarding

10         my last request.  I have trouble

11         sleeping at night due to the pain, and I

12         can feel the bumps in my legs with every

13         movement when I walk.  It's become

14         unbearable.  I've waited for over two

15         weeks now, and I haven't been -- been

16         called to medical or seen by a doctor of

17         any sort."

18         I think I might have said it.  Just to be

19 thorough, October 14th:

20              "Following up once more.  I've not

21         been seen by anyone for weeks."

22         Then we have that appointment, that October 15th

23 appointment which I want to say is largely attributed to

24 this Court and putting it in that order and then obviously

25 the work of Ms. Shen.  Following that, he says:

10

1          "Per our conversation regarding the
2          rods, metals and screws in my legs, I'm
3          writing to let you know that my left leg
4          is starting to lose some range of motion
5          in terms of it bending going up and down
6          in my bed.  Please advise on what to do
7          as it's become exhausting to do my day-
8          to-day activities such as cleaning,
9          walking and sitting for long periods of
10         time."
11         October 18th:
12         "Hello, I'm requesting any sort of
13         follow up of any kind in regards to my
14         legs.  It's become an unlivable
15         condition.  I'm not able to move around
16         without pain anymore.  Please let me
17         know any updates urgently and
18         desperately.  Thank you."
19         October 19th, just "Hello" and two question marks.
20  October 20th:
21         "I discovered -- hello, I've
22         discovered more bumps growing on the
23         back of my left leg this morning."
24         October 21st:
25         "Hello, I am losing my mobility in

1    my left leg, and there is bumps growing

2    on my right leg that is starting to hurt

3    as I walk.  I asked the doctor for a

4    cane or a walker to help me to not put

5    too much pressure on my left leg as it's

6    already hurting too much, and they

7    simply say they have nothing for me.

8    The pain is growing by the day, and I

9    feel that nothing is being done to help

10   me."

11   October 23rd:

12        "Hello, I'm writing to note to the

13   doctor that I'm having random pain where

14   I don't feel certain places in my upper

15   leg, and I feel as if my nerves are

16   stopping to function, which during that

17   time I'm forced to use the cane.  I've

18   experienced this multiple times this

19   week.  I'm extremely worried that at

20   some point I may have nerve damage in my

21   entire leg and may not be able to move

22   it for long periods of time.  What can I

23   possibly do to prevent this?  I've been

24   taking the meds prescribed."

25   So, your Honor, based on that, I was going to ask

12

1  for the following:

2          If we can, in fact, get him to his surgeon

3  immediately, great.  But, if not, I was going to ask for a

4  followup status conference to see where we're at with things

5  and then at that point move under Subsection (I) as a

6  medical necessity.

7          THE COURT:  Okay.  So -- so, a couple of things.

8  First, just -- just to confirm, it -- what I was -- it

9  sounds like Mr. Iza has been prescribed pain medication?

10 Because I heard a lot of complaints about pain, and then I

11 heard a reference to taking the pain medication but has Mr.

12 Iza received pain medication?

13         MR. SADAT:  Yes, your Honor, but the type of pain

14 medication they prescribed is nothing to -- significant.

15 It's Tylenol, basically Extra Strength Tylenol if I'm not

16 mistaken.

17         THE COURT:  Um-hmm.

18         MR. SADAT:  I believe that's in the notes, in the

19 medical notes.

20         THE COURT:  Okay.  And -- and I see that he does

21 have a cane.  Has he been prescribed -- has he been provided

22 with some device to assist with walking and take the

23 pressure off his legs?

24         MR. SADAT:  He's asked for that.  It looks like

25 they have finally been able to accommodate him recently.

13

1    The issue that we're having, your Honor, is

2 because it's medically necessary to remove this from his

3 body ASAP, we essentially have a -- a ticking time bomb in

4 his legs.  It can go off at any minute.  He can permanently

5 become a crippled.  And normally you would say, Well, maybe

6 that -- that comment is a bit exaggerated, but it's

7 coinciding with these lumps becoming increasingly bigger on

8 his legs.  I know that our investigator, Mr. Romero, was

9 able to get in contact with another doctor who specializes

10 in this, and while the first doctor in Vegas did not say one

11 way or another that these lumps were necessary consistent

12 with the surgery, this other doctor indicated that these

13 lumps were, in fact, indicative of it and that we needed to

14 act urgently.

15    I would just also point out, your Honor, that this

16 is a situation where -- and -- and, by the way, his family

17 is here all again, his father, his mother, his close friend

18 here in Orange County, and other relatives here.

19    THE COURT:  Welcome.

20    MR. MOHAMED:  (Indiscernible.)

21    MR. SADAT:  Sure.  Is it okay if he takes two

22 minutes, your Honor, to address the Court briefly?

23    THE COURT:  Sure.

24    MR. SADAT:  Come on up.

25    MR. MOHAMED:  Hi.  I'm Asad Mohamed (phonetic).

14

1  I'm  Adam's father.  So, this second time I come in with my
2  son for this hearing.  Just I want to tell you something.
3  We left my country 2005.  This time Adam is five years old.
4  I stay to Syria six years because this time is my country
5  revolt.  I stay in Syria six years.  This time Adam 11 years
6  old.  I come to United States.  Adam go to school, go
7  through high school.  Adam forgot Arabic, speak Arabic.
8  Adam American 1,000 percent.  He have citizen American.  We
9  have citizen American, wife, children.  I have three girls
10 born here.  I'm good family.  Adam have good friends.  I
11 told the Probation -- Mr. Probation called me, called my
12 family.  Mr. Probation told me, You can do anything for your
13 son?  I told him, Yeah, sure.  He say, You can sign?  I told
14 him, Yeah, sure, me sign, wife sign, my daughter sign.  I
15 have my -- another son who's 21 sign.  I have two property
16 in St. Louis, Missouri.  I told him I sign for this
17 property.  Now, Mr. -- sorry.  Now, Adam, he have
18 professional surgery.  Adam needs help.  You know, Adam
19 needs somebody get him to bathroom, somebody clean, somebody
20 eating.  I live in Missouri.  Adam live in L.A.
21          Now I promise, me and my wife and my family live
22 with Adam here.  Okay.  I sign everything for Adam.  You can
23 have him GPS, okay.  You can go to doctor, hospital, do
24 surgery.  I promise 100 percent Adam show up to court.  Adam
25 not have family in Iraq.  All my family is passed -- passed

15

1  away.  My dad passed away.  My mom passed away.  I have
2  three brothers passed away because war in Iraq this time,
3  2005.  Now Adam not have any family in Iraq, not speak very
4  well Arabic.  Adam love United States.  Adam live in United
5  States.  Now I told you again I promise 100 percent I -- me
6  and my family live with Adam in L.A.  Adam no technology, no
7  phone, no go anywhere, just go hospital, go doctor, go
8  shopping with me.  I help get Adam out now because Adam do
9  not have chair.  Okay.  Adam need help this time.
10         Just I told you help my -- help family for Adam.
11  But at least because I told you, a friend for Adam, wife,
12  friends for Adam.  Everything good.  I have paper for
13  doctor.  I have -- I have paper for (indiscernible).  Adam
14  not come into contact (indiscernible) out.  Okay.  But this
15  time Adam work with you with case, okay, show every time --
16  every time, but, please, this time Adam need help because
17  Adam is medical (indiscernible), need surgery, need -- thank
18  you, sir.
19         THE COURT:  Okay.
20         UNIDENTIFIED SPEAKER:  I'm working and --
21         THE COURT:  So, hold -- so, hold on.
22         UNIDENTIFIED SPEAKER:  (Indiscernible.)
23         THE COURT:  So, hold on.  Only one at a time.
24  I'm --
25         MR. SADAT:  Ms. (indiscernible), you can come on

1 up.

2            UNIDENTIFIED SPEAKER:  I'm working --

3            MR. SADAT:  Come here.

4            UNIDENTIFIED SPEAKER:  (Indiscernible.)

5            THE COURT:  Okay.

6            UNIDENTIFIED SPEAKER:  (Indiscernible.)

7            THE COURT:  Hold -- hold on.

8            UNIDENTIFIED SPEAKER:  (Indiscernible.)

9            THE COURT:  So --

10           UNIDENTIFIED SPEAKER:  (Indiscernible) -- it's not

11 enough.  He need to see the doctor, please.

12           THE COURT:  Are you Mr. Iza's mother?

13           UNIDENTIFIED SPEAKER:  No.  His mother.

14           THE COURT:  You're --

15           UNIDENTIFIED SPEAKER:  My husband, we came, my

16 husband and my kids.

17           THE COURT:  I see.

18           UNIDENTIFIED SPEAKER:  Eight years old.

19           THE COURT:  And you're --

20           UNIDENTIFIED SPEAKER:  For him.

21           THE COURT:  -- a family friend or cousin?

22           UNIDENTIFIED SPEAKER:  We are very close family.

23           THE COURT:  Oh, you're the family.

24           UNIDENTIFIED SPEAKER:  My husband is more family

25 for (indiscernible)

17

```
 1          THE COURT:  So, here's --
 2          UNIDENTIFIED SPEAKER:  I know him -- I know him 20
 3 years.  We went to his house and everything.  He's a good
 4 boy.
 5          THE COURT:  So, here -- so, here -- so, here's
 6 where we are in terms -- in terms of big picture, and I know
 7 it's -- I -- first of all, I appreciate you attending.
 8          UNIDENTIFIED SPEAKER:  Tylenol isn't -- it's not
 9 enough.  Please.  The Tylenol, you go to the medicine, they
10 give you Tylenol.  Doctor, they give you Tylenol.  They need
11 more exam, more checking --
12          THE COURT:  Right.
13          UNIDENTIFIED SPEAKER:  -- him, please.
14          THE COURT:  Understood.  Look, there's -- the
15 reason the Bureau of Prisons only gives out Tylenol is
16 because of preventing --
17          UNIDENTIFIED SPEAKER:  My husband --
18          THE COURT:  -- substance abuse --
19          UNIDENTIFIED SPEAKER:  -- he just have surgery
20 that --
21          THE COURT:  Understood.
22          UNIDENTIFIED SPEAKER:  -- he have a stroke --
23          THE COURT:  And, again --
24          UNIDENTIFIED SPEAKER:  (Indiscernible) they give
25 you Tylenol, Tylenol, Tylenol --
```

18

1           THE COURT:  And I --

2           UNIDENTIFIED SPEAKER:  (Indiscernible.)

3           THE COURT:  And I -- and I appreciate you coming
4  in.  As I -- as I said last time, I think it says a lot
5  about Mr. Iza that so many of you support -- but hold on a
6  minute.  If I'm going to let you talk, let me just sort of
7  remind you where we are, which is I've ordered Mr. Iza
8  detained pending trial because I found that there were no
9  conditions or combination of conditions that could
10 reasonably assure his -- his future appearance and/or the
11 safety of the community.  You know, if you -- one of the
12 important facts was that Mr. Iza was arrested about to board
13 a flight to I think it was Switzerland with a one-way
14 ticket.  There's a lot of reasons to -- am I factually
15 mistaken?

16          MR. SADAT:  Your Honor, if you recall, the flight
17 was a romantic flight with his girlfriend that was canceled.

18          THE COURT:  Okay.  I --

19          MR. SADAT:  So, he didn't end up going and wasn't
20 planning on going.

21          THE COURT:  I -- I recall your -- your -- your
22 take on things, understood.  But -- but I -- I set forth --
23 I set forth my reasons at the last hearing.  I stand by
24 that.  What I also said very clearly is I want to make sure
25 that Mr. Iza gets appropriate medical attention.

19

1          Recall that Mr. Iza I believe was supposed to get
2   this procedure done over a year ago, and he chose not to for
3   whatever reason, and I understand why now he absolutely
4   wants to get it done, but he is in federal custody at the
5   moment, and what I can do is to try to make sure that he
6   gets appropriate medical attention in federal custody.  He's
7   received the medical screening evaluation.  He's received a
8   referral to a specialist, and the IMS -- maybe that's the
9   Inmate Medical System.  I'm not sure what it stands for, but
10  the Federal Bureau of Prisons is working through the
11  appropriate process to find an appropriate specialist.  They
12  have been moving quickly in the scheme of things.  It's
13  been, what, two weeks since the last time we chatted.
14          So, I'm glad, Mr. Sadat, that you're in -- in
15  contact with Ms. Shen.  At this point, I think the best
16  thing to do is for you to keep following up with her and
17  figure out -- say, Hey, what's the timeline for the IMS
18  service to determine an appropriate referral to a
19  specialist?  Sounds like they're considering a number of
20  options which seem reasonable.  At this point, I would say
21  let's -- let's see how that goes.  I'm happy to set another
22  check-in in a week or two weeks, whatever you think is
23  appropriate, and let's see where they are, and let's make
24  sure that the BOP keeps moving forward.  At this point, I
25  haven't seen any evidence that the BOP is incapable or

20

1  unwilling in providing the specialty care that Mr. Iza wants

2  and needs.  They have demonstrated to the contrary, that

3  they are willing and making appropriate efforts to do that.

4          So, my goal is to keep moving things forward to

5  make sure he gets appropriate medical attention.  He does

6  not at this point need to be released in order to get that

7  medical attention.  If it appears that the BOP is unwilling

8  or unable to provide the appropriate medical are, then I may

9  reconsider that decision.  At this point, I see evidence

10 that they are willing and they are making efforts to provide

11 appropriate medical care.

12         So, that's where we are.  That's only my decision.

13 Mr. Sadat has already sought review from another judge, as

14 Mr. Iza is entitled to do.  And, so, another judge may feel

15 differently, but that's where I am.  And -- and I'm fine if

16 you want to come forward and you want to say something

17 briefly.  That would be fine.  Just one at a time.  Okay.

18     (Pause.)

19         AHMED:  My name is Ahmed (phonetic), a friend to

20 Adam almost like seven years.

21         THE COURT:  Um-hmm.

22         AHMED:  I want to tell you something about I have

23 issues with medical here in United States.  I have got

24 accident from three years ago.  I make six surgery.  For --

25 for system, for -- for healthcare here, I should be see a

21

1  doctor for -- after three days.  (Indiscernible)  I see the
2  doctor appointment after one year, two months because I take
3  medication -- medication wrong for one year, two months for
4  working for the system for medical he give me for
5  neurosurgery doctor.  For this reason I worry about Adam.
6  He can have infection for leg, and the system here will be
7  so slow, but I don't know why you're looking for
8  (indiscernible) Adam for -- about his health after you kind
9  of bring private doctor for him, thinking about his health.
10              And, another thing, for any (indiscernible) of
11 paper for anything I can sign for him.  I can sign anything
12 for him because he -- he good man, but if he were to use the
13 system, he can -- he have infection in his leg.  He have
14 something immediate in the leg, but here the system so slow.
15 Tylenol not help.
16              THE COURT:  Okay.  So, I think -- I think I
17 understood you -- you offering to provide a surety, and I
18 heard your concerns about the speed of being able to get him
19 treatment.  So, my goal is to keep that  moving quickly.
20 Right now it is moving along.  So, we -- we do have to give
21 the BOP an opportunity to determine the best specialist
22 referral.  They've already given them a referral, and, so,
23 let's -- let's give them an opportunity to do that.
24              AHMED:  It's not -- not like a specific doctor
25 make decision.  I -- I telling you I have issues.  I have --

22

1 I see first doctor my heart.  He sent for me this normal

2 doctor make it for me.  I make a two surgery because he send

3 it for me as specialty for doctor.  For -- four the -- the

4 court, he can let him long.  There's no specialist.

5           MR. SADAT:  Just his mom to say something briefly.

6           THE COURT:  Sure.

7           UNIDENTIFIED SPEAKER:  (Indiscernible.)

8           THE COURT:  Sure.

9           UNIDENTIFIED SPEAKER:  Just I want talk to Court.

10 Just I need me stay here, he go out, please, because this is

11 very important.  He need surgery.  This is danger for him.

12 If you take long time here, he have death, he have many

13 things.  Believe me -- believe me, if you go (indiscernible)

14 I -- I -- put me too in GPS, anything you want.  Just we

15 need go out.  Please, because he need -- please.

16           THE COURT:  I -- I'm sorry that I can't, that I

17 can't offer you something more satisfying of what you want

18 to do, but --

19           UNIDENTIFIED SPEAKER:  I (indiscernible) you want.

20 We do any -- anything you want.

21           THE COURT:  -- but we will -- but we will keep --

22           UNIDENTIFIED SPEAKER:  We do it.

23           THE COURT:  -- but we will keep on the efforts to

24 make sure that he gets an appropriate specialist referral so

25 that --

23

1    UNIDENTIFIED SPEAKER:  This is surgery -- this is

2 not easy.

3    MR. SADAT:  So, your Honor --

4    THE COURT:  Understood.

5    MR. SADAT:  -- first of all, I appreciate your

6 patience in hearing everybody.  I think we're all actually

7 saying the same thing.  We're just looking at it a bit

8 differently.

9    So, you've said some very important things.  You

10 said that you wanted to make sure things were moving

11 quickly.

12    THE COURT:  Um-hmm.

13    MR. SADAT:  And, from your perspective, it has

14 been moving quickly.  From the family's perspective, every

15 day that goes past, they're concerned that their son is

16 going to be permanently crippled.

17    THE COURT:  Um-hmm.

18    MR. SADAT:  I -- I would hope that there's a way

19 to compromise that.  I don't think there is from their

20 perspective, right?  And perhaps if -- if this was our loved

21 one too, we might have a different vantage point of it as

22 well.  With that said, I would ask if the Court is not

23 inclined to find that it is medically necessary to release

24 him today to get the surgery, I would ask for as quick as

25 possible a date that we can come back where your Honor would

24

1  feel that if BOP did not act by that date, you would

2  determine it to be not quick enough.

3          THE COURT:  Well, why don't we do this?  My

4  suggestion is that you reach out to Ms. Shen and see if she

5  can get any estimate on the referral decision.  I'd like to

6  -- I'd like to see what IMS wants to do.  That's -- that's

7  the right process.  Again, from -- from Mr. O'Brien's

8  representation about what they're doing is they're

9  evaluating who is an appropriate specialist who can provide

10 appropriate evaluation of Mr. Iza's needs.  That's exactly

11 what should be happening.  So, I'm glad that is happening.

12 We need them to make a decision.  So, let's -- let's see

13 what we can do there.

14         I would reach out to her.  Let's see what she

15 says, and maybe one or both of you can file an updated -- it

16 doesn't -- I don't have a preference.  It can be a joint

17 update, whoever it's easier.  Somebody file an update and

18 let us know just as soon as you have answer, whether that's

19 tomorrow or in a week.  You know, hopefully, let's try to

20 get it within a week, try to get some reasonable response

21 time and, so, hopefully she can say like either here's the

22 decision or, I'll have the decision by this date.  You know,

23 I also -- I understand people don't want to sit around

24 indefinitely.  We want to have some sort of, Hey, we're

25 working towards something.  So, let's -- let's see if we

25

1 can't get some guidance within seven days of, Okay, we

2 either have a decision or we're going to make a decision.

3 Let's -- again, you got -- we have to -- we have to try to

4 be reasonable with -- with the BOP process but hold their

5 feet to the fire and keep moving things forward.  And,

6 again, I -- so far they're being responsive, which is a good

7 thing, and, you know, so, I -- I don't see anything from

8 them saying that they can't or won't provide the care that's

9 needed.

10          MR. SADAT:  That was the other thing that you had

11 mentioned that I thought was significant.  You said that you

12 want it to be moved quickly and also that if you found out

13 that the BOP was not willing and/or was incapable, then you

14 would be inclined to release him temporarily for --

15          THE COURT:  Then I would --

16          MR. SADAT:  -- the medical procedure.

17          THE COURT:  Then I would reconsider.  I'm not --

18 you know, I'll have to -- I'm not going to prejudge that

19 decision.

20          MR. SADAT:  And I don't -- I don't think the issue

21 is that they're not willing.  I think clearly their efforts

22 indicate that they're willing to do this.  The issue that I

23 have brought up from the beginning and what the family is

24 expressing is that they are incapable of doing it unless it

25 gets specifically assigned to this doctor and done

26

1    immediately.

2          Now, Mr. O'Brien has given me some hope that that

3    can be done, and hopefully that -- that comes to fruition.

4    But if it does not within a week, your Honor, I would just

5    ask that you really take this to heart because, for what he

6    is being accused of, I understand that it's serious.  But at

7    the same time, it's not worth having somebody -- a 24-year-

8    old kid end up crippled for the rest of his life.

9          THE COURT:  Of course not.

10         Anything else, Mr. O'Brien?

11         MR. O'BRIEN:  A couple of things, your Honor.

12   First of all, I wanted to indicate to the Court that the

13   Defendant filed an appeal of the detention order, and the

14   parties have been instructed to file a joint statement

15   tomorrow.  There has not yet been a hearing scheduled for

16   the detention appeal.

17         THE COURT:  Right.

18         MR. O'BRIEN:  And, so, I want to make sure that

19   things are proceeding in a linear fashion.  And then --

20         THE COURT:  And -- and it's also a little -- I

21   think things got a little confused.  So, I signed the order

22   releasing the transcript for use in the appeal.  I do think

23   the Court got a little confused in terms of you initially

24   got assigned a duty judge, but now there is a District

25   Judge.  So, I'll leave that to you to figure out who's the

27

1  right judge.  It's a little unclear to me at this point.  It

2  seems like it -- I'll leave that to you.

3          MR. O'BRIEN:  I think it will be going to the

4  assigned judge, but I've asked for clarification of the two

5  court reporters -- sorry -- court clerks.

6          I also think that there's a little bit disconnect

7  as to what medical information the Defendant was presenting

8  to the Court and what they've provided to the Government,

9  and I'd like the Defense to provide the Government with the

10 documents he referenced in his arguments today.  I did

11 receive the series of emails in which the Defendant made his

12 own subjective statements as to his --

13         THE COURT:  Um-hmm.

14         MR. O'BRIEN:  -- condition.  I have not received a

15 document in which the doctor in Nevada said that he's in a

16 unique position to provide the surgery and that he's the

17 number one expert in the field, nor have I received a report

18 that a local doctor has determined that the lumps are

19 consistent with the medical implants.  So, I'd like the

20 Defense to provide me with those documents as well.

21         THE COURT:  Any issue with that, Mr. Sadat?

22         MR. SADAT:  Your Honor, I am almost 100 percent

23 sure that I -- I have provided that followup letter from

24 Doctor D. to Mr. O'Brien, and I'm just scrolling through my

25 emails right now.

28

1          THE COURT:  Okay.  But, if not, you'll -- you're

2   happy to provide it I assume?

3          MR. SADAT:  Absolutely.  Yes, absolutely.

4          Your Honor, can we --

5          THE COURT:  I mean, I'm not -- yeah, just for --

6   for purposes of the record, I'm not sure how a local doctor

7   can make any kind of clinical finding about Mr. Iza who is

8   in custody.  So, you know, I don't really know how to give

9   that any weight.  But --

10          MR. SADAT:  We had provided the doctor with just

11   photographs, this local one, I think Doctor -- what was the

12   name of the gentleman?

13          MR. ROMERO:  (Indiscernible.)

14          MR. SADAT:  Yes.

15          MR. ROMERO:  (Indiscernible.)

16          MR. SADAT:  Is it okay if he talks, your Honor,

17   just briefly as the Court -- go ahead and come on up.

18          MR. ROMERO:  Good afternoon, your Honor.  My name

19   is Armani Romero.  I'm a private investigator working for

20   the defense of Mr. Iza.

21          THE COURT:  Good afternoon.

22          MR. ROMERO:  So, I believe Mr. Sadat made

23   reference -- or is referring to an ongoing exchange of

24   emails.  There's a Doctor -- forgive me -- H-R-A-Y-R, Hrayr

25   Bosmajian (phonetic).  He's in Pomona, and he is one of a

29

1  few doctors that specialize in this sort of subspecialty,

2  and he's emailed me yesterday -- he emailed me yesterday at

3  7:59 p.m., and if the Court will allow me, I'll -- I'll read

4  what he said, if that's okay.

5          THE COURT:  You can -- you can just provide it

6  written --

7          MR. ROMERO:  Okay.

8          THE COURT:  -- written down.  It's just -- again,

9  he hasn't -- it's -- it's helpful.  You can provide it to

10  Ms. Shen and the BOP, but, you know, I'm not sure I'm

11  qualified to do anything with it.  He -- the doctor hasn't

12  examined Mr. Iza.

13          What the IMS will do, what -- what it is their

14  function to do and what is their expertise to do is to -- to

15  do this, is to identify an appropriate medical professional

16  to provide the care that Mr. Iza needs.  So, that's the

17  process I'm focused on.  That's who -- that's -- that's the

18  process that I think should take place, and -- and it may be

19  that they agree that -- with the physicians that you would

20  like, but it is their role to identify an appropriate

21  physician.  And, so, let's see -- let's see what their

22  determination is.  And, obviously, these things could be

23  helpful to them.  So, thank you for that.  You can -- you

24  can provide it to Ms. Shen.  Mr. Sadat can do that.

25          MR. ROMERO:  Thank you.

30

1          THE COURT:  Anything else from the parties?

2          MR. SADAT:  Your Honor, in terms of a status

3   conference, I was going to ask to come back exactly one week

4   from today.

5          THE COURT:  Let's do this.  Let's get -- let's get

6   a status report just filed.  You know, let's see what it

7   says, and then -- and then let me set one after that.  I --

8   if -- if we get a response before seven days, then great.

9   We can take action even sooner than that.  But let's --

10  let's -- I want to be able to evaluate what the answer is

11  and then -- and then you can make a request in the status

12  report of what you think's appropriate, and -- and, as you

13  know, I can -- I can set a status conference the next day.

14  I'm -- I'm very flexible.  So, but let's -- I don't want to

15  waste everybody's time.  Let's make sure we can keep things

16  moving, and let's see what the answer is on this first

17  question.

18          The question is either can you give us an answer

19  or when can we have a determination from IMS on an

20  appropriate specialty referral for Mr. Iza.  That's the

21  goal.

22          MR. SADAT:  And, your Honor, when you say

23  appropriate specialty referral, you mean, when the actual

24  surgery would take place or are you talking about when the

25  consultation would take place?

31

1       THE COURT:  He needs to have a consultation first,
2   right.  I mean, he has been seen by -- a general medicine
3   practitioner I assume has referred him to a specialist.  The
4   IMS service is determining -- is trying to identify an
5   appropriate specialist.  He needs to now be seen by a
6   specialist.  Yes, that will be a consultation.  It may be
7   video for all I know, but that's step one.  You -- before
8   you get scheduled for surgery, you need to have a
9   consultation.
10       MR. SADAT:  I'm just anticipating this, and I'd be
11  shocked if it doesn't end up being this way.  The
12  consultation that they're going to have him with is going to
13  be an orthopedic surgeon, but it's not going to be someone
14  with a subspecialty of leg lengthening.
15       THE COURT:  Well, let's see.
16       MR. SADAT:  So, if that is the case, we would
17  obviously let you know that right away.  But I would just
18  ask this, because when you put that order in last time, it
19  really helped get things moving with Ms. Shen.  If you could
20  just put some kind of minute to that effect so that when I
21  reach out to her and try to get an answer to that, I can try
22  to get it right away.
23       THE COURT:  Sure.  Let me -- I'll -- I'll think
24  about -- I'll issue something.  As you know, Ms. -- I don't
25  have jurisdiction over Ms. Shen.  So, I can't really order

32

1 her to do things, but -- but, yes, I will issue a minute

2 order, and you're welcome to use it, and hopefully it will

3 be helpful.  Again, based on your own experience and mine,

4 she is a consummate professional who is responsive, and you

5 shouldn't need my order, but I'm happy to give it to you.

6          Okay.  Anything else?

7          MR. O'BRIEN:  Nothing further from the Government,

8 your Honor.

9          THE COURT:  Okay.  Well, thank you to the family

10 for coming in.  I understand how upsetting this is for you,

11 you know.  So, I appreciate your being here.  Again, I'm --

12 I'm sorry I can't give you what you want today.  What I'm

13 going to do is try to make sure that your son receives the

14 appropriate medical attention.  That's really what I can do

15 and what I'll focus on.

16          THE CLERK:  This court is now adjourned.

17     (Proceedings adjourned.)

18

19

20

21

22

23

24

25

33

1        I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5    /s/Jordan Keilty                              11/1/2024
     Transcriber                                   Date
6
     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
     /s/L.L. Francisco
9    L.L. Francisco, President
     Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25