TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Chief Assistant United States Attorney
Chief, Criminal Division
MAXWELL K. COLL (Cal Bar No. 312651)
Assistant United States Attorney
Deputy Chief, National Security Division
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-1785
E-mail: maxwell.coll@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ADAM IZA,<br>aka "The Godfather,"<br>aka "Ahmed Faiq,"<br>aka "Diego,"<br>aka "Diego Facebook,"<br>aka "Tony Brambilla,"<br>aka "Leo,"<br><br>Defendant. | No. CR 2:24-00630-PA<br><br><u>GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT ADAM IZA</u> |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney's Office for the Central District of California and Assistant United States Attorney Maxwell K. Coll, hereby files its sentencing position for defendant ADAM IZA.

This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the United States Probation and Pretrial Services Office's presentence investigation report, and such further evidence and argument as the Court may permit.

Dated: September 14, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

JENNIFER L. WAIER
Chief, Criminal Division

MAXWELL K. COLL
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Defendant Adam IZA's criminal conduct was extraordinary in both scale and character. Through a sophisticated fraud scheme, defendant obtained unauthorized access to Meta advertising accounts and associated lines of credit, sold that access to others, and received approximately $37 million in proceeds. Defendant then concealed millions of dollars in income from the Internal Revenue Service, resulting in a tax loss of more than $13 million. At the same time, defendant used his substantial financial resources to retain sworn law-enforcement officers and enlist them in furtherance of his personal disputes, including to obtain confidential law-enforcement information, misuse judicial process, intimidate and threaten victims, and facilitate acts of violence.

Defendant's conduct resulted in a total offense level of 30 and an advisory Guidelines range of **97 to 121** months' imprisonment. As set forth in the government's separately filed motion, the government requests a five-level downward departure, resulting in a total offense level of 25 and an advisory Guidelines range of **57 to 71** months' imprisonment. Consistent with its obligations under the plea agreement, the government recommends that the Court impose a sentence at the low end of that range.

Defendant also faces substantial restitution obligations arising from his conduct. The Court should order $23,250,766 in restitution to the IRS; $127,000 in restitution to Victim L.A.; and $25,000 in restitution to Victim R.C. In addition, because the losses suffered by other victims have not yet been fully determined, the Court should defer the final determination of restitution as to Meta, Victim E.Z.,

and Victim D.D.

Defendant was recently sentenced in the District of Connecticut to 180 months' imprisonment for his participation in a separate attempted cryptocurrency robbery and kidnapping scheme. As discussed below, because that conviction arises from conduct distinct from the offenses here, the Court has discretion to impose the sentence in this case concurrently with, partially concurrently with, or consecutively to the Connecticut sentence.

## II. STATEMENT OF FACTS

On January 30, 2025, defendant IZA pleaded guilty pursuant to a plea agreement to one count of wire fraud, in violation of 18 U.S.C. § 1343, one count of conspiracy against rights, in violation of 18 U.S.C. § 241, and one count of evasion of tax assessment, in violation of 26 U.S.C. § 7201. (Dkts. 101, 117.) In the plea agreement and at the change-of-plea hearing, defendant agreed to the following facts:

Background

Defendant is a United States citizen who resided in Los Angeles and Orange Counties, California during the 2020, 2021, 2022, 2023 calendar years.

On January 30, 2020, defendant incorporated Zort, Inc. ("Zort"). Defendant was engaged in a romantic relationship with Co-Schemer 1. On January 31, 2020, defendant and Co-Schemer 1 jointly opened a Bank of America account for Zort.

At defendant's direction, Co-Schemer 1 created and became the sole director and sole officer of various nominee entities and also opened bank accounts and engaged in financial transactions for the

nominee entities. On February 8, 2021, Co-Schemer 1 incorporated Dream Agency ("Dream"). On April 27 and October 6, 2021, respectively, Co-Schemer 1 opened Bank of America and Chase Bank accounts for Dream. On April 8, 2022, Co-Schemer 1 incorporated Rise Agency ("Rise"). On April 8, 2022, Co-Schemer 1 opened a Chase Bank account for Rise. On April 8, 2022, Co-Schemer 1 caused her personal assistant to incorporate Atlas Marketing Agency, Inc. ("Atlas"). On April 22, 2022, Co-Schemer 1 and her assistant jointly opened a Chase Bank account for Atlas.

Wire Fraud

Facebook, Inc. and Meta Platforms, Inc. (collectively, "Meta") provide major advertising clients with business manager accounts that have access to premium advertising slots on the Facebook platform. These business manager accounts are provided with line of credit that allows a client to post advertisements in advance of making payment. After a line of credit is partially depleted, Meta issues a monthly invoice that requires its client to replenish the account. Upon receipt of payment, the credit line is restored to its initial spending limit.

During the period December 2020 through September 2024, defendant fraudulently gained access to Meta business manager accounts and their associated lines of credit. Defendant then sold access to the compromised business manager accounts and lines of credit to various advertising companies thereby making substantial profits. From approximately 2020 through 2022, defendant received approximately $37 million associated with the sale of access to the

Meta advertisement accounts into the Zort, Dream, and Rise bank accounts from domestic and international payors.

As a result of the fraud, Meta clients were billed for, and paid for, advertising expenditures they did not incur. Where Meta or Meta clients discovered the fraudulent billing, Meta refunded its clients, thereby suffering the loss.

Defendant initially was introduced to the fraudulent scheme through Co-Schemer 2. Co-Schemer 2 purchased access to the Meta business manager accounts and credit lines from Co-Schemer 3, who resided in Kosovo. Co-Schemer 3 gained access to the Meta business manager accounts and credit lines through phishing attacks in which Co-Schemer 3 would falsely pose as a legitimate owner of the accounts. Beginning in December 2020, defendant assisted Co-Schemer 2 in the fraudulent scheme by routing sales proceeds into defendant’s business, Zort. Defendant also received income from Zort via the fraudulent scheme in the form of cryptocurrency.

In January 2021, Co-Schemer 2 asked defendant to hold onto Co-Schemer 2’s electronic devices on a temporary basis which defendant then exploited to assume control of the fraudulent Meta scheme. Defendant sent cryptocurrency to Co-Schemer 3 to purchase compromised Meta business manager accounts and credit lines, sold clients access to the compromised accounts, and received payments for such access via wire transfers into Zort’s bank account, as well as via cryptocurrency.

As early as May 2021, defendant had personally engaged in phishing against Meta, thereby cutting out Co-Schemer 3 as the middleman. Defendant fraudulently posed as legitimate Meta clients,

accessed Meta client business manager accounts, sold access to the associated lines of credit to his clients, and received payments from clients via wire transfers into the Zort, Dream, and Rise bank accounts.

For example, between January 22 through February 19, 2022, defendant fraudulently accessed a business manager account owned by victim AGM, allocated portions of AGM's lines of credit to four different business manager accounts, and sold access to those lines of credit to defendant's own clients, which resulted in the following spending against AGM's line of credit:

| Account | Invoiced Amount |
|---|---|
| XXXX9224 | $13,620 |
| XXXX1908 | $6,279 |
| XXXX3506 | $45,174 |
| XXXX0869 | $41,762 |

On February 19, 2022, Meta restricted access to AGM's line of credit based upon suspicious activity on the account. On March 8, 2022, after receiving Meta invoices requesting payments in the amounts referenced above for advertising that AGM had not incurred, AGM notified Meta of the fraud and requested compensation which Meta ultimately provided.

On March 9, 2022, in furtherance of the fraudulent scheme, defendant caused an interstate wire transfer in the amount of $37,540 to be transmitted from a client to Dream's Chase Bank account.

<u>Tax Evasion</u>

From 2020 through 2023, defendant, through Zort, Rise, Dream, and Atlas, received, at a minimum, the following gross income from

customers who had purchased fraudulent access to Meta advertisement accounts:

| Year | Amount |
|---|---|
| 2020 | $4,852,750 |
| 2021 | $18,414,314 |
| 2022 | $9,341,034 |
| 2023 | $3,752,746 |
| **Total** | **$36,360,844** |

resulting in the following losses to the United States Treasury:

| Year | Amount |
|---|---|
| 2020 | $1,755,357 |
| 2021 | $6,772,725 |
| 2022 | $3,414,346 |
| 2023 | $1,343,724 |
| **Total** | **$13,286,152** |

Despite knowing that he had a legal duty to file federal individual tax returns for each of the calendar years 2020 through 2023, defendant failed to file any individual tax returns for any of the calendar years 2020 through 2023.

Despite knowing that he had a legal duty to file federal corporate tax returns on behalf of Zort, defendant failed to file any corporate tax returns for any of the calendar years 2020 through 2023.

Defendant willfully and affirmatively attempted to evade the assessment of the federal taxes due and owing to the United States of America by (a) concealing his ownership and control of Zort, including in his communications with advertising clients, (b)

concealing his control of Dream, Rise, and Atlas through the use of a nominee, Co-Schemer 1, (c) causing Co-Schemer 1 to expend funds obtained through the fraudulent schemes to acquire personal items for the benefit of defendant and Co-Schemer 1, and (d) transferring income received by Zort, Dream, Rise, and Atlas to cryptocurrency custodians.

Conspiracy Against Rights

From in or around August 2021 through April 2022, defendant hired off-duty Los Angeles County Sheriff Department ("LASD") deputies to provide him with personal security.

Defendant knowingly and intentionally conspired with these law enforcement officers to obtain confidential law enforcement information, personally identifiable information ("PII") about persons with whom defendant had financial and other disputes (the "victims"), and court-authorized search warrants to track down and harass the victims. While using the sobriquet "The Godfather," defendant also knowingly and intentionally enlisted the LASD deputies to intimidate and threaten these victims. These actions deprived these victims of their free exercise and enjoyment of rights secured to them by the Constitution and laws of the United States, that is, the right to be free from unreasonable searches and seizures and the right to be free from deprivation of liberty and property without due process of law by one acting under color of law.

In furtherance of the conspiracy, defendant, the LASD deputies, and others committed the following overt acts, among others:

On August 16, 2021, at defendant's direction, two LASD deputies unholstered their firearms in defendant's office while defendant

demanded that Victim R.C. transfer $25,000 to a Zort bank account that defendant controlled;

On September 24, 2021, at defendant's direction, a LASD deputy, whose private security company defendant was paying approximately $100,000 per month, informed a LASD narcotics detective that a confidential informant reported that Victim R.C. was selling narcotics and storing large quantities of fentanyl and cocaine at Victim R.C.'s residence in Los Angeles; the LASD deputy deliberately did not disclose to the narcotics detective the deputy's relationship with defendant or that defendant was paying the LASD deputy large sums of money;

In or around September 2021, defendant, a Co-Conspirator, and a LASD deputy discussed and agreed to a plan whereby they would cause Victim R.C. to be arrested with illegal drugs by law enforcement officers;

On September 27, 2021, a Co-Conspirator picked up Victim R.C. in Los Angeles in a vehicle, purportedly to take him to the Co-Conspirator's residence; at defendant direction, the Co-Conspirator made certain that Victim R.C. purchased illegal drugs and made certain that those illegal drugs were placed within the vehicle;

On September 27, 2021, at defendant's direction, a LASD deputy conducted a traffic stop of the vehicle, arrested Victim R.C. for an outstanding arrest warrant, seized narcotics found within the vehicle, and charged Victim R.C. with transportation of a controlled substance, causing Victim R.C. to be jailed for several days;

On October 6, 2021, the LASD narcotics detective who received information about Victim R.C. from the LASD deputy in defendant's

employ obtained a warrant from a Los Angeles County Superior Court judge to search Victim R.C.'s residence, which was executed on October 12, 2021;

On October 20, 2021, at defendant's direction, LASD deputies in the defendant's employ restrained Victim L.A. from leaving defendant's residence while defendant held Victim L.A. at gunpoint and forced him to transfer $127,000 into the Dream bank account;

On November 21, 2021, while defendant and Victim E.Z. were meeting outside a gas station/convenience store in Riverside County, and for the purpose of obtaining a laptop containing large amount of cryptocurrency ("the Laptop") that defendant believed to be in the possession of Victim E.Z, one of defendant's bodyguards brandished a firearm at Victim E.Z. at defendant's direction, at which point Victim E.Z. ran and called 911;

Beginning in or around November 2021 and continuing into March 2022, at defendant's direction, LASD deputies in the defendant's employ accessed and/or used sensitive and confidential law enforcement databases to obtain personal identifying information regarding Victim E.Z., Victim D.D., their family members and acquaintances, and others, in violation of LASD policies restricting the use of such databases to official LASD business;

In or around January 2022, defendant and an LASD deputy employed by defendant discussed and agreed that the deputy would attempt to locate Victim E.Z. by obtaining a search warrant related to Victim E.Z.'s telephone number;

On January 6, 2022, the LASD deputy applied for and obtained a search warrant from a Los Angeles County Superior Court judge for GPS

location information associated with multiple telephone numbers, including Victim E.Z.'s telephone number; in the sworn affidavit supporting the warrant application, the LASD deputy falsely stated that Victim E.Z.'s telephone number was associated with a suspect in a firearms investigation;

In or around January 2022, at defendant's direction, the LASD deputy used the GPS location information obtained from the warrant to locate Victim E.Z. and a residence where Victim E.Z. was staying;

On March 12, 2022, an individual employed by defendant and at defendant's direction assaulted Victim D.D. and stole a laptop, mistakenly believed by defendant to be the Laptop, from Victim D.D.; and

On March 30, 2022, defendant relayed information to a third party about his desire to have Victim E.Z. relinquish the Laptop through use of force if necessary. As a result, the third party caused three armed individuals to force entry into Victim E.Z.'s residence and use firearms to force Victim E.Z. to relinquish the Laptop; as the three armed individuals forced open the door of Victim E.Z.'s residence, Victim E.Z. fired in their direction and they fled.

**III. USPO SENTENCING GUIDELINES CALCULATIONS**

On August 31, 2026, the United States Probation Office ("USPO") issued the PSR. (Dkt. 143.) The PSR found that the following Guidelines factors applied:

**<u>Count 1</u> (Conspiracy Against Rights)**

| | | |
|---|---|---|
| Base Offense Level | 12 | U.S.S.G. § 2H1.1(a)(2) |
| Public official and color of law | +6 | U.S.S.G. § 2H1.1(b)(1) |

| | | |
|---|---|---|
| Aggravated Role | +4 | U.S.S.G. § 3B1.1(a) |
| **Total Offense Level** | **22** | |

**Count 2 (Wire Fraud)**

| | | |
|---|---|---|
| Base Offense Level | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss between $25,000,000 and $65,000,000 | +22 | U.S.S.G. § 2B1.1(b)(1)(L) |
| Sophisticated Means | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| **Total Offense Level** | **31** | |

**Count 3 (Tax Evasion)**

| | | |
|---|---|---|
| Tax loss between $9,500,000 and $25,000,000 | 26 | U.S.S.G. § 2T4.1(K) |
| Criminal Activity | +2 | U.S.S.G. § 2T1.1(b)(1) |
| Sophisticated Means | +2 | U.S.S.G. § 2T1.1(b)(2) |
| **Total Offense Level** | **30** | |

**Grouping / Combined Offense Level (U.S.S.G. § 3D1.4)**

Count One Group (offense level 22) = 0 units

Count Two Group (offense level 31) = 1 unit

Count Three Group (offense level 30) = 1 unit

Total units: 2

Combined offense level: 33

**Total Offense Level**

| | | |
|---|---|---|
| Combined Offense Level | 33 | U.S.S.G. § 3D1.4 |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1 |
| **Total Offense Level** | **30** | |

(PSR ¶¶ 51-89.) Based on a Criminal History Category of I, and a total offense level of 30, the USPO calculates the applicable Guidelines range as **97 to 121 months.** (PSR ¶ 134.)

**IV. THE GOVERNMENT AGREES WITH THE PSR BUT REQUESTS A FIVE-LEVEL DEPARTURE**

The government has filed a contemporaneous motion requesting a five-level departure.

***

After the government's requested five-level departure, the corresponding offense level is **25**, which, with a Criminal History Category of I, results in an advisory Guidelines range of **57 to 71 months.** Per the plea agreement, the government recommends a low-end sentence of 57 months' imprisonment.

**V. THE GOVERNMENT RECOMMENDS A LOW-END 57 MONTHS' IMPRISONMENT**

Per the plea agreement, the government respectfully recommends that defendant be sentenced to the resulting low end of 57 months' imprisonment, followed by three years of supervised release, and a $300 special assessment. Such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

**A. The Nature and Circumstances of the Offense**

The nature and circumstances of defendant's offenses weigh heavily in favor of a substantial custodial sentence. Defendant's conduct was prolonged, sophisticated, and extraordinarily serious. He generated tens of millions of dollars through a fraud scheme, concealed millions of dollars in income from the IRS, and then used his wealth to retain and corrupt sworn law-enforcement officers for his own private purposes. Defendant paid substantial sums to LASD deputies, enlisted them to obtain confidential law-enforcement information and misuse judicial process, and deployed them against individuals with whom he had personal and financial disputes.

The resulting conduct included armed intimidation, the manipulation of law-enforcement processes to cause a victim's arrest, the use of a warrant obtained under false pretenses to locate another victim, an assault and theft, and an attempted armed home invasion. The breadth, duration, and escalating nature of this conduct distinguish this case from an isolated act of fraud, tax evasion, or official misconduct and demonstrate the seriousness of the offenses before the Court.

Perhaps lost amid the sheer volume of defendant's criminal conduct is the October 20, 2021 incident involving Victim L.A. On that date, at defendant's direction, LASD deputies in his employ restrained Victim L.A. from leaving defendant's residence while defendant held Victim L.A. at gunpoint and forced him to transfer $127,000 into a bank account defendant controlled. Standing alone, that conduct is extraordinarily serious. In the context of this case, it also illustrates the degree to which defendant used paid

law-enforcement officers and the threat of violence to advance his private financial interests.

**B. Need to Afford Adequate Deterrence**

A meaningful custodial sentence is also necessary to afford adequate general deterrence.

With respect to the civil rights conspiracy, general deterrence is particularly important where a private individual uses money to induce sworn law-enforcement officers to misuse their official authority. Individuals with substantial financial resources must understand that they cannot purchase access to confidential databases, investigative tools, warrants, arrests, badges, or firearms for use in private disputes. A substantial custodial sentence is necessary to deter other private clients from attempting to corrupt law-enforcement officers by paying them to perform acts they could never lawfully accomplish themselves.

With respect to the substantial tax charge, the Introductory Commentary to Section 2T of the Sentencing Guidelines specifically recognizes that when imposing sentence for tax crimes, general deterrence is a primary concern:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition

> that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. Part T, Introductory Commentary. The Ninth Circuit agrees. United States v. Orlando, 553 F.3d 1235, 1239 (9th Cir. 2009) (affirming an upward variance in a tax evasion case because the guideline range "failed to capture tax crimes' particular sensitivity to deterrence").

A low-end custodial sentence can forewarn others of the consequences of engaging in a multi-year tax fraud. In short, compliance with the Internal Revenue Code will be unattainable if the public believes that there are no meaningful repercussions for willful failure to comply with the tax laws. Imposing meaningful sanctions on defendant will send a message to others that cheating on your taxes results in meaningful punishment.

General deterrence is also important with respect to defendant's fraud. Large-scale cyber-enabled fraud can generate enormous profits while appearing remote from its victims. A meaningful custodial sentence is necessary to deter others who might otherwise view such schemes as lucrative crimes with limited personal consequences.

**C. Defendant's Acceptance of Responsibility and Mitigation**

Defendant's acceptance of responsibility weighs meaningfully in his favor. When confronted with the government's investigation, defendant promptly accepted responsibility and thereafter pleaded guilty to all three offenses. He has admitted the seriousness of his conduct and has not sought to minimize his role in it. The government therefore does not seek a sentence that ignores

defendant's acceptance or the mitigating circumstances presented to the Court. A sentence of 57 months' imprisonment appropriately balances those considerations against the seriousness and sustained nature of defendant's misconduct and the substantial need for general deterrence.

**D. Need to Avoid Unwarranted Sentencing Disparities**

The sentences imposed in the related cases arising from criminal conduct performed for Iza provide useful benchmarks. On March 16, 2026, the Court sentenced LASD Deputy Michael David Coberg to 63 months' imprisonment. See United States v. Michael David Coberg, 2:25-cr-00767-PA (Dkt. 29). On July 13, 2026, the Court sentenced LASD Deputy Scott Allen Simpkins to 18 months' imprisonment. See United States v. Scott Allen Simpkins, 2:26-cr-00133-PA (Dkt. 29). On July 20, 2026, the Court sentenced LASD Deputy David Anthony Rodriguez to 12 months' imprisonment. See United States v. David Anthony Rodriguez, 2:25-cr-00486-PA (Dkt. 50). And on September 14, 2026, the Court sentenced LASD Deputy Christopher Michael Cadman to 21 months' imprisonment. See United States v. Christopher Michael Cadman, 2:25-cr-00583-PA. The government has also recommended a sentence of 18 months' imprisonment for Eric Chase Saavedra, who operated Saavedra & Associates and coordinated the work of numerous LASD deputies hired to provide services to Iza. See United States v. Eric Chase Saavedra, 2:25-cr-00035-PA.

The Court may also consider the related prosecution of Iris Ramaya Au, who pleaded guilty to subscribing to a false tax return, in violation of 26 U.S.C. § 7206(1), after admitting that she failed to report more than $2.6 million in income obtained through defendant

Iza's criminal activities and, among other conduct, established nominee companies and bank accounts used in connection with those activities. See United States v. Iris Ramaya Au, 2:25-cr-00140-PA (Dkt. 57). Au is scheduled to be sentenced on September 21, 2026, and the government has recommended a sentence of 18 months' imprisonment.

Here, a sentence of 57 months appropriately accounts for the sentences imposed and the government's recommendations in the related cases. The government's recommended sentence here is substantially greater than the 21-month sentence imposed on Cadman, the 18-month sentence imposed on Simpkins, the 12-month sentence imposed on Rodriguez, and the sentence recommended by the government for Saavedra. Although the Court imposed a longer sentence of 63 months on Coberg, the comparison does not suggest that defendant Iza's conduct was less serious. Coberg operated independently of Saavedra & Associates, served as a consultant directly to defendant Iza, and pleaded guilty to conspiracy to commit Hobbs Act extortion. Defendant Iza nevertheless presents materially different mitigating circumstances that warrant the substantial reduction reflected in the government's separately filed departure motion.

Consistent with its obligation under the plea agreement to recommend no more than the low end of the applicable Guidelines range, the government recommends 57 months' imprisonment for Iza.

**VI. RESTITUTION AND VICTIM IMPACT STATEMENTS**

While defendant IZA signed and executed IRS closing agreements, defendant has not yet satisfied his outstanding tax liability to the IRS. The government thus requests that the sentence include a

restitution order of **$23,250,766** payable to the IRS. This amount is the tax and penalties owed for the calendar years 2020, 2021, 2022, and 2023. Defendant's obligation to pay statutory interest pursuant to the closing agreements remains unaffected.

Defendant IZA should also be ordered to pay restitution jointly and severally as follows:

- **$127,000** to Victim L.A., jointly and severally with defendant Michael David Coberg; and
- **$25,000** to Victim R.C., jointly and severally with defendant Christopher Michael Cadman.

The government is continuing to work with Meta and Victims E.Z. and D.D. to ascertain additional losses for which restitution may be appropriate. Because those losses are not presently ascertainable, the government requests that the Court defer final determination of restitution as to those victims pursuant to 18 U.S.C. § 3664(d)(5) and set a date for the final determination of those losses within 90 days after sentencing.

Additionally, the government has contemporaneously filed under seal the victim impact statements of Victims E.Z. and D.D.

## VII. THE COURT HAS DISCRETION TO ORDER CONCURRENT OR CONSECUTIVE SENTENCES

Defendant is also subject to an undischarged 180-month term of imprisonment imposed by the United States District Court for the District of Connecticut following his conviction for conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951. United States v. Adam Iza, 3:25-CR-00030-SVN (D. Conn.) (Dkt. 311). The

Court therefore must determine the relationship between that sentence and the sentence imposed in this case.

Section 5G1.3 of the Sentencing Guidelines addresses the imposition of a sentence where a defendant is already subject to an undischarged term of imprisonment. If the offense underlying the undischarged term constitutes relevant conduct to the instant offense under U.S.S.G. § 1B1.3(a)(1), (a)(2), or (a)(3), § 5G1.3(b) generally requires that the sentence for the instant offense run concurrently with the undischarged term. See U.S.S.G. § 5G1.3(b). For subsection (b) to apply, all of the prior offense must constitute relevant conduct to the instant offense. See id. cmt. n.2(A).

Here, the Connecticut conviction arose from a separate Hobbs Act robbery conspiracy and does not constitute relevant conduct to the wire-fraud, tax-evasion, or civil-rights offenses before this Court. Accordingly, § 5G1.3(b) does not govern. See United States v. Fifield, 432 F.3d 1056, 1064-66 (9th Cir. 2005). Indeed, the many named victims here have no connection to the victims in the Connecticut case: Victim L.A., Victim R.C., Victim D.D., Victim E.Z., Meta, and the IRS.

Instead, § 5G1.3(d) applies. Under that provision, the Court may impose the sentence in this case concurrently with, partially concurrently with, or consecutively to defendant's Connecticut sentence "to achieve a reasonable punishment for the instant offense." U.S.S.G. § 5G1.3(d). In making that determination, the Court should consider the factors set forth in 18 U.S.C. § 3584, the type and length of the prior undischarged sentence, the amount of time served and likely to be served on that sentence, the fact that

the prior sentence was imposed by another court, and any other circumstance relevant to determining an appropriate sentence for the instant offense. U.S.S.G. § 5G1.3 cmt. n.4(A).

Section 3584 likewise provides that, when a defendant is already subject to an undischarged term of imprisonment, the Court may impose the new term concurrently or consecutively. 18 U.S.C. § 3584(a). In exercising that discretion, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). See 18 U.S.C. § 3584(b). The Ninth Circuit has recognized that these provisions afford district courts discretion to impose concurrent, partially concurrent, or consecutive sentences. See United States v. Shouse, 755 F.3d 1104, 1108 (9th Cir. 2014); Fifield, 432 F.3d at 1064-66.

**VIII. CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence defendant to 57 months' imprisonment and three years of supervised release, order restitution of $23,250,766 to the IRS, $127,000 to Victim L.A., $25,000 to Victim R.C., defer final determination of restitution as to Meta and Victims E.Z. and D.D., and impose a $300 special assessment.